23-MJ-7352-JCB

# AFFIDAVIT OF SPECIAL AGENT JOHN CHRISTENSEN

I, Special Agent John Christensen, being duly sworn, state as follows:

## INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I began working with ATF in September 2020. I am a graduate of the ATF National Academy Special Agent Basic Training and the Federal Law Enforcement Training Center Criminal Investigator Training Program. Before becoming an ATF Special Agent, I was a New York City Police Department (NYPD) Patrol Officer at the 115 Precinct for four years. During my time as a Patrol Officer, I patrolled a designated area of the city via police cruiser to preserve law and order, and to prevent and discover the commission of crime. I conducted such duties as monitoring, noting, reporting, and investigating suspicious persons and situations, safety hazards, and unusual or illegal activity in patrol areas. I have conducted preliminary investigations, gathered evidence, interviewed witnesses and victims, conducted arrests, and testified as a witness in court.

2. Since joining ATF, I have investigated federal firearms violations, including participating in the controlled purchases of firearms, surveillance of firearms traffickers, conducting interviews of suspects, participating in search warrants, and conducting electronic surveillance. I have investigated firearms trace data, cellular phones, and email accounts in which firearms sales are facilitated. I have also interviewed defendants, informants, and suspects who were users, sellers, and distributors of controlled substances. On the basis of my training and experience, I am familiar with the vernacular used by illegal drug users and distributors. I am acquainted with the methods by which such persons seek to disguise the

1

subject of their conversations and operations, and I am familiar with the methods, practices, and techniques by which individuals illicitly transport, store, and distribute controlled substances. I am also familiar with the various paraphernalia used to manufacture, process, deliver, dispense, and use controlled substances.

3. Since March 2022, I have been investigating Caesar ROSS and others for firearms trafficking and other violations of federal firearms and drug laws.

4. Based on my training and experience, I know that it is a violation of Title 18, United States Code, Section 922(g)(1) for any individual who has previously been convicted of a felony offense and knows they have been so convicted to possess a firearm or ammunition in or affecting interstate commerce. I also know that it is a violation of Title 21, United States Code, Section 841(a)(1), for any person to knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. I am also aware that fentanyl is listed as a Schedule II controlled substance, under the drug scheduling guidelines.

5. I make this affidavit in support of a criminal complaint charging Caesar ROSS (DOB xx-xx-1984) with illegally possessing firearms in violation of 18 U.S.C. § 922(g)(1) and illegally possessing and distributing Schedule II controlled substances in violation of 21 U.S.C. § 841(a)(1).

6. The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that ROSS violated 18 U.S.C. § 922(g)(1) and 21 U.S.C. § 841(a)(1).

It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

## USE AND RELIABILITY OF A COOPERATING WITNESS ("CW-1")

7. CW-1, whose identity is known to this affiant, was the target of an ATF firearms trafficking investigation and has agreed to plead guilty in another district to an Information charging CW-1 with making false statements to a firearms dealer in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). CW-1 has a signed cooperation agreement and is cooperating in the hope of receiving consideration at sentencing.

8. CW-1 has proffered with ATF agents and has related, in sum and substance, that on multiple occasions in 2020, CW-1 purchased numerous firearms in Florida for the purpose of transporting them to Boston, Massachusetts. CW-1 identified a photograph of ROSS as depicting the individual to whom CW-1 traveled to Boston, Massachusetts in the past to provide firearms purchased in Florida. CW-1 has related, in sum and substance, that in 2020, on several occasions, CW-1 would purchase firearms in Florida, travel to Massachusetts to meet with ROSS, and would provide ROSS with firearms with obliterated serial numbers in exchange for fentanyl.

9. CW-1's participation in these firearms trafficking activities has been confirmed and corroborated by purchase records, historical cell site location information, toll records, and the recovery in Massachusetts of firearms purchased by CW-1 in Florida. In total, ATF records show that CW-1 purchased a total of 29 firearms in Florida between May and October 2020; at least three of these firearms have been recovered in Massachusetts.

10. After signing the cooperation agreement, CW-1 agreed to conduct a controlled purchase of fentanyl from ROSS, in which CW-1 would agree to provide ROSS with firearms in

exchange for ROSS providing him with fentanyl. That controlled purchase, described further below, occurred on the afternoon of September 5, 2023.

11. Information that CW-1 has provided to agents since agreeing to cooperate has been corroborated by phone records, recordings, and agent observations, and I consider the information provided by CW-1 to be reliable.

## PROBABLE CAUSE

### CW-1 Communications with ROSS Setting Up Controlled Purchase

12. On August 12, 2023, at the direction of agents, CW-1 contacted ROSS at (857) 393-8687 (the "Target Telephone Number"), which, as established in my prior Affidavit in 23-MJ-5330-JGD, attached as Exhibit A, is used by ROSS. ROSS and CW-1 communicated briefly through text messages. In sum and substance, CW-1 communicated that CW-1 would be coming up (to Boston) for work in a couple weeks and figured CW-1 would hit ROSS up. ROSS responded, "Hit me." These text messages were preserved. According to CW-1, ROSS responding, "Hit me" is how they would interact in the past to confirm the deal before CW-1 would purchase the firearms. As to these text communications, CW-1 explained that, in the past, CW-1 would contact ROSS a week or two before buying firearms to confirm the deal was still happening. By the end of the month, ROSS would ask CW-1 to buy certain make and models of firearms. CW-1 would then contact ROSS and confirm with ROSS once CW-1 purchased the firearms before CW-1 drove to BOSTON. CW-1 would drive near ROSS's then-residence in Dorchester, MA. ROSS would come out of his residence and enter CW-1's vehicle. After they exchanged fentanyl for the firearms, ROSS would walk back into his residence and CW-1 would return to Florida.

13. On August 24, 2023, CW-1 received a phone call from ROSS at the Target Telephone Number.[1] ROSS and CW-1 communicated briefly over the phone. In sum and substance, CW-1 communicated that CW-1 has been working with a friend at gun shows and CW-1 has some good firearms. ROSS responded with, "Well what you trying to do?" CW-1 asked ROSS, "Same as before if that's good?" ROSS then stated, "Yeah, I got you but I'll need a little time and the numbers changed some, so we're gonna have to talk. Is everything the same with you, same numbers?"[2] CW-1 stated, "Yeah but I got better quality because of the shows." ROSS then said, "Oh yeah that's bet, we'll need to talk work things out the numbers changed a lil." CW-1 then talked to ROSS about the "hockey pucks."[3] ROSS then asked CW-1 when CW-1 plans on coming up (to Massachusetts) because he needs a little time. CW-1 responded, "I was planning on September 5 through 7th." ROSS stated, "Oh yeah that'll work." CW-1 and ROSS ended by saying they will talk to each other on another date to discuss their deal.

14. On Tuesday, August 29, 2023, CW-1 called the Target Telephone Number and had a conversation with ROSS.[4] ROSS and CW-1 communicated briefly over the phone. In sum and substance, ROSS and CW-1 discussed the details of their deal. Although they did not

---

[1] The call was not recorded as it was spontaneous and unexpected, but CW-1 notified me immediately and I interviewed CW-1 about the conversation. Accordingly, although I use quotation marks reflecting the statements that CW-1 told me that CW-1 and ROSS each made, the statements are not exact quotes.
[2] Based on my training and experience and my familiarity with this investigation, I believe that in this conversation, ROSS is indicating that he still wants to continue doing business of trading firearms for fentanyl just as they did before. When ROSS states the numbers have changed, I believe he means the price of the fentanyl has gone up so he will not be providing the same amount as he did in previous buys.
[3] CW-1 stated ROSS and CW-1 would refer to the fentanyl as hockey pucks because the fentanyl was of an amount and in a shape that looked like a hockey puck.
[4] The call was recorded but some of the conversation did not record due to the bad service on CW-1's phone. CW-1 notified me immediately and I interviewed CW-1 about the conversation. Accordingly, this summary attempts to convey the substance of the conversation as reported by CW-1, but should not be construed as direct quotes.

explicitly use the terms "fentanyl" and "firearms," ROSS communicated that in the past he used to trade 80 grams of fentanyl to CW-1 for the firearms. ROSS indicated that the price has changed and he will now trade the firearms to CW-1 for 50 or 60 grams of fentanyl. CW-1 indicated that CW-1 has four firearms to trade. ROSS then told CW-1 to call him three days prior before driving to Massachusetts. The conversation ended with CW-1 and ROSS both agreeing to talk to each other at a later date.

15.  As set forth in Exhibit A, over the course of the next week, ROSS and CW-1 had numerous additional conversations confirming the details of the deal, in which CW-1 would provide ROSS with four firearms in exchange for ROSS providing CW-1 with 60 grams of fentanyl. On Monday, September 4, 2023, CW-1 confirmed that CW-1 was headed to Massachusetts to meet ROSS Tuesday, September 5.

16.  Over the course of multiple calls and over text messages on September 5, 2023, which were recorded and preserved, ROSS and CW-1 ultimately agreed to meet around 3:30 p.m. that day on Smith Street in Quincy, Massachusetts. Smith Street intersects with Arthur Street, the street on which ROSS lives. *See* Exhibit A.

### September 5, 2023 Purchase of Approx. 60 Grams of Fentanyl from ROSS In Exchange For Four Firearms

17.  On the afternoon of September 5, 2023, agents equipped CW-1 with covert electronic recording and transmitting equipment that was being simultaneously monitored by agents and provided CW-1 with four real firearms that had been rendered inoperable, which were to be used to make the fentanyl purchase. These firearms were provided to CW-1 inside a maroon drawstring bag, wrapped up in a sweatshirt and a t-shirt. While under the surveillance of law enforcement officers, CW-1 traveled to a lot behind 27 Arthur Street in Quincy, which is

near the agreed location.[5] CW-1 then called ROSS, in a recorded call, to give ROSS CW-1's precise location and ROSS agreed to go there.

18. At approximately 3:30 p.m., CW-1 met with ROSS inside a vehicle that agents had provided to CW-1, while the vehicle was parked in a lot behind 27 Arthur Street. CW-1 sat in the driver's seat, and ROSS sat in the front passenger seat. CW-1 took the firearms out of the maroon bag, unwrapped them, and showed them to ROSS. CW-1 and ROSS then both re-wrapped the firearms, and CW-1 placed them back in the bag and handed ROSS the bag containing the firearms. ROSS held the bag on his lap. ROSS handed a bag containing two large knots of a tan/white powder to CW-1. CW-1 told ROSS (falsely, at the direction of agents) that CW-1 had ammunition for the firearms in the back seat, and exited the driver's seat as if to retrieve the ammunition. ROSS also opened the passenger door and exited the passenger's seat, holding the bag containing the firearms and starting to take it with him.

19. As CW-1 and ROSS exited the vehicle, agents drove up behind them. ROSS saw the vehicles coming towards him, called out, "Police!" and threw the bag containing the firearms back in the car on the passenger side and ran in the direction of his residence. Agents gave chase and were able to place ROSS under arrest. In a search incident to arrest, agents located an identification card in the name of Caesar ROSS; the photograph on the card depicted the individual that agents placed under arrest. Agents also seized ROSS's cell phone. Agents called the Target Telephone Number, and the phone that had been on ROSS's person rang.

20. Immediately after exiting the vehicle, CW-1 was met by agents. CW-1 turned over the two knots of suspected fentanyl. Thereafter, agents searched CW-1 again for money or

---

[5] Prior to meeting with ROSS, law enforcement searched CW-1 for money and contraband, with negative results except for the firearms that ATF had provided to CW-1.

contraband with negative results. Agents then debriefed CW-1 regarding the events of the controlled purchase.

21. Agents placed the suspected fentanyl on a digital scale, and the scale registered a weight of 66.4 grams including packaging. Agents conducted a field test of the suspected fentanyl using a TruNarc Raman Spectrometer. The substance tested positive for the presumptive presence of fentanyl. The fentanyl was transported to the Quincy Police Department to be logged into evidence, pending transportation to a drug laboratory for further analysis.

22. Agents took photographs of the firearms that CW-1 provided to ROSS and their markings.

23. ATF Special Agent Michael Nuttall, who is trained to perform interstate commerce nexus examinations, examined those photographs. He determined that the firearms are:

   a. a Beretta 92F, 9 parabellum, pistol, with no visible external serial number;

   b. a Beretta 96 Brigadier elite IA, .40S&W pistol, with no visible external serial number;

   c. a Glock 22, .40S&W pistol, with no visible external serial number; and

   d. a FN Herstal 5.7, 5.7x28 pistol, with no visible external serial number.

24. Based on his examination of the firearms and their markings as depicted in the photographs, Special Agent Nuttall determined that each was a "firearm" for purposes of federal law. Based on his training and experience, Special Agent Nutall is aware that neither Glock, Beretta, nor FN Herstal manufacture firearms in the Commonwealth of Massachusetts, and thus he determined that each firearm had traveled in and affected interstate commerce prior to being

seized in Quincy on September 5, 2023.

25. I monitored the above-described controlled purchase live and also reviewed a video recording of the purchase, and the recording corroborates the above account of the controlled purchase.

**ROSS's Status Prohibiting Him From Possession of Firearms; Knowledge of Status**

26. I have reviewed ROSS's criminal history, which indicates that ROSS was convicted of a felony in 2018, in the Dorchester District Court, for Distribution of a Class A Substance, for which he was sentenced to one year in the house of corrections. Based on my training and experience, I know that Distribution of a Class A Substance is punishable under Massachusetts law by imprisonment for more than one year.

27. ROSS was also convicted for a separate felony offense in 2013, in the Suffolk Superior Court for Distribution and Possession of Cocaine, which is also punishable under Massachusetts law by imprisonment for more than one year; ROSS was sentenced to 2.5 years and one day in prison.

28. Among other reasons, because ROSS was sentenced to 2.5 years and one day in prison for a prior conviction, he must have known at the time that he committed the instant offense that he had been convicted in a court of a crime punishable by a term of imprisonment exceeding one year.

## **CONCLUSION**

29. Based on the information described above, I submit that there is probable cause to believe that on September 5, 2023, Caesar ROSS, (1) having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, and knowing he had been so convicted, did possess in and affecting commerce four firearms in violation of Title 18, United States Code, § 922(g)(1); and (2) did distribute and possess with intent to distribute Schedule II controlled substances, specifically fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

_____
JOHN CHRISTENSEN
SPECIAL AGENT, ATF

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this 6th day of September, 2023.

_____
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS